IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

|  |  |  |
|---|---|---|
| JUDY (KINNEY) MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:04-cv-12027-NMG |
| | ) | |
| STERICYCLE, INC. and SCHERER | ) | |
| HEALTHCARE, INC. d/b/a | ) | |
| BIOSYSTEMS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF'S RETALIATION CLAIMS (COUNTS III & IV) AND HER CONSTRUCTIVE DISCHARGE CLAIM (COUNT V)

## I.    PRELIMINARY STATEMENT

After Plaintiff Judy Kinney complained to her supervisor on April 30, 2003, that a co-worker was sexually harassing her, Defendants investigated her claims and, despite finding no corroborating evidence, warned the alleged harasser and changed his start time and daily routine so that he never again came in contact with Kinney. Even though the harassment never reoccurred after April 30, 2003, Kinney demanded that the alleged harasser be discharged and later quit after her request to borrow paid vacation was denied. Kinney now claims that the Defendants' response was not timely because she had allegedly been complaining since late February 2003 and that Defendants retaliated against her by denying her request to borrow paid vacation even though nobody else was allowed to do so.

Kinney filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") on June 2, 2003, alleging sexual harassment. On June 23, 2003, she filed an amended charge claiming Defendants retaliated against her by denying her request for paid vacation. After submitting position statements and rebuttals to the MCAD, the parties engaged in

ninety days of discovery that included the exchange of written discovery requests and answers, as well as the depositions of Kinney and her supervisor, Stericycle's Area Vice President of Human Resources and the alleged harasser. Less than one week before the parties were due to submit memoranda of fact and law to the MCAD, Kinney withdrew her complaint so that she could file this lawsuit.

Defendants bring this motion for partial summary judgment at this juncture because the discovery conducted by the parties under the auspices of the MCAD conclusively establishes that the Company's response to her April 30 complaint effectively remedied the alleged harassment. As such, summary judgment is appropriate as to Kinney's constructive discharge because once the Defendants effectively put an end to the harassment there was no reason for Kinney to resign. There can be no dispute that the working conditions after April 30, 2003 were far from intolerable and thus no cause to quit.

Nor is Kinney entitled to take her retaliation or constructive discharge claims to trial. BioSystems denied Kinney's request for paid vacation time because employees do not become eligible for paid vacation under the applicable collective bargaining agreement until their one year anniversary date. Kinney had been with the Company for only seven months at the time she made her request and was not yet allowed to take paid vacation. While she claims that other employees were allowed to take paid vacation before their one year anniversary, she could not identify a single one by name.

As such, this Court should grant this motion for partial summary judgment, dismiss Counts III and IV and hold as a matter of law that Defendants' response to Kinney's April 30, 2003 complaint effectively remedied the alleged harassment as of that date.

CHICAGO/#1297606.4
3774722v1

## II.  STATEMENT OF UNDISPUTED FACTS

### A.  Background

BioSystems, a wholly owned subsidiary of Stericycle, Inc., collects and processes reusable sharps containers at health care facilities such as hospitals, clinics and doctors' offices. (Deposition of Judy (Kinney) Martin, Tab A, at 92.)  Stericycle acquired BioSystems in January 2003. (Deposition of Marlynn Cohen, Tab B, at 11.)

Kinney worked as a route driver at BioSystems' Haverhill, Massachusetts facility from November 27, 2002, until she resigned on June 12, 2003. (Tab A, Kinney Dep. 92; Kinney Dep. Ex. 8.)  As a driver, Kinney serviced customers along a set route, collecting reusable sharps containers. (Tab A, Kinney Dep. 162.)  At all times, Kinney was a member of and represented by Teamsters Local 170 and the terms and conditions of her employment were governed by a collective bargaining agreement between BioSystems and Local 170.  (Tab A, Kinney Dep. 95.)

Rick Salmonsen was the New England General Manager for BioSystems.  (Deposition of Joe D'Agata, Tab C, at 14.)  Phil Davis was the Haverhill Facility Manager and Joe D'Agata worked as a Field/Operations Coordinator.  (Tab C, D'Agata Dep. 13, 15.)  Marlynn Cohen, hired February 17, 2003 as Stericycle Area Vice President of Human Resources, had responsibility for Stericycle and BioSystems facilities in a number of states, including Massachusetts. (Tab B, Cohen Dep. 7-8.)

### B.  Defendants respond to Kinney's April 30, 2003 complaint

On Wednesday, April 30, 2003, Kinney approached Operations Coordinator D'Agata claiming that another BioSystems driver, William Martin, walked up behind her earlier that day, leaned against her for a second or two and reached around her causing his wrists to make contact with her breasts.[1]  (Tab A, Kinney Dep. 27, 29, 99-101, 107-108, 110-112.)  Kinney also reported

---

[1]   Martin denies Kinney's allegations and testified that he simply put his hands on her shoulders and said, "How's

CHICAGO/#1297606.4
3774722v1

the alleged incident to Facility Manager Davis, explaining that she did not want Martin fired or anyone else to get in trouble. (Tab A, Kinney Dep. 151-152.)

Two days later, on Friday, May 2, 2003, General Manager Salmonsen spoke with Kinney. She recounted the alleged incident and repeated that she did not want Martin to be fired as a result of her complaint. (Tab A, Kinney Dep. 155-156.) Salmonsen assured her that the Company would not tolerate harassment and that he would investigate and develop an appropriate action plan. (Tab A, Kinney Dep. 156, 158-159.) Later that day, Salmonsen told Cohen that he had just met with Kinney and that she claimed Billy Martin followed her around the warehouse, brushed up against her and called her honey. Salmonsen then told Cohen that he planned to have Martin report early each day, have D'Agata escort him around him the facility and have him load his truck in the afternoon. Cohen agreed that this seemed like an appropriate response. (Tab B, Cohen Dep. 37.)

The following Monday, May 5, 2003, Salmonsen sent a memo to Cohen summarizing Kinney's complaint and his subsequent discussion with Martin. He noted that Martin denied the harassment allegations and acknowledged that he may have called Kinney "honey" on occasion. Salmonsen also reported that Martin said that he may have inadvertently bumped into Kinney. (Tab B, Cohen Dep. 52; Cohen Dep. Ex. 2.)

Davis met with Kinney a second time on Tuesday, May 6, 2003, and gave her a letter confirming her earlier discussion with Salmonsen. (Tab A, Kinney Dep. 165.) The letter also outlined the Company's response; namely, that the Company would take steps to ensure Martin had no further contact with her and be required to apologize to her. (Tab A, Kinney Dep. 167; Kinney Dep. Ex. 12.) Kinney refused to sign the letter and demanded that the Company discharge Martin. Kinney did not explain why she wanted Martin terminated only four days after she said she did not

---

it going, kid? What's your route tomorrow?" (Deposition of William Martin, Tab D, at 36-37.)

CHICAGO/#1297606.4
3774722v1

want him to get in trouble. From her perspective, Martin's termination was *the only remedy she would find acceptable.* (Tab A, Kinney Dep. 166-167.)

### C.    No further harassment occurs after April 30, 2003

Area VP for HR Cohen spoke with Kinney on or about May 19, 2003 and told her that Martin's employment would not be terminated "automatically" or without first conducting an investigation. She also explained they would need some kind of corroboration of Kinney's story. Kinney suggested that another female employee, Mindy, had left because of Martin. Kinney also claimed that Davis laughed at her when she reported the alleged harassment. (Tab B, Cohen Dep. 43-44, 46-47, 50-51.) Cohen contacted Davis and questioned him about Kinney's claims and he denied laughing at Kinney. Cohen also asked Salmonsen if Davis laughed when Kinney reported her allegations and was told her claims were taken very seriously. (Tab B, Cohen Dep. 46.)

Cohen also questioned D'Agata about Mindy and learned that D'Agata knew her very well and that she left BioSystems because she was too slight to move the 100 pound carts used by the Company, not because of any harassment by Martin. (Tab B, Cohen Dep. 50-51.) When Cohen reported back to Kinney that Mindy was not harassed by Martin, Kinney simply stated, "It's not about Mindy." (Tab B, Cohen Dep. 50-51.)

Despite the fact that nobody corroborated Kinney's allegations and she was unable to point the Company a single co-worker who ever witnessed Martin harass her, the Company nonetheless took steps to prevent further contact between the two. First, the Company changed Martin's reporting time from the 4:00 a.m. required of all the drivers to 3:30 a.m. This was done so that Martin could complete the morning's preparations and depart before Kinney arrived for work. To further prevent contact between the two, the Company required Martin to report each morning directly to D'Agata who would accompany him while he gathered his paperwork and loaded his

truck. (Tab C, D'Agata Dep. 65-66.) The Company also informed Kinney that it would require Martin to load his truck at the end of his shift (after Kinney had left) so that he would spend even less time in the facility each morning. (Tab A, Kinney Dep. 172).

Although Martin regularly returned after Kinney had departed work for the day, the Company also instituted precautions to prevent Martin from having any contact with Kinney at the end of their respective shifts. The Company instructed Martin that he would have to pull off to the side of the road if Kinney was still in the facility when he was returning to work and wait there until she had departed. Once she left, Martin would be informed by two-way radio that he could return to the facility. (Tab D, Martin Dep. 47; D'Agata Dep. 66-67.) The Company directed Martin to sign a statement, which he did, acknowledging these changes and his agreement to abide by them. (Tab D, Martin Dep. 46, 63; Martin Dep. Ex. 7.)

After these measures were implemented, Kinney never complained again about Martin harassing her. Martin never again made any sexual remarks to her after April 30, 2003. In fact, Martin never spoke to her again and never got close enough to touch her. (Tab A, Kinney Dep. 184-185.) Martin never saw Kinney again at the beginning of the day. (Tab D, Martin Dep. 48.) He recalled only seeing her on one occasion in the afternoon when she returned to the facility earlier than expected while he was getting in his truck to leave. (Tab D, Martin Dep. 49.) Kinney now recalls that Martin stared at her on occasion. (Complaint at ¶ 25.)

### D.   Kinney nonetheless demands that the Company discharge Martin

Despite having no further contact with Martin, Kinney continued to insist that the Company terminate his employment. After May 8, 2003, Cohen telephoned Kinney to touch base with her. Cohen confirmed that the Company was moving Martin's start time to 3:30 a.m. so that he would be out of the facility by the time she arrived and asked what else she wanted done. Kinney responded

that she could not work in the same workplace as Martin and that she wanted him fired. This, Kinney explained, was the only remedy she would find acceptable. Cohen responded that she felt Kinney was being unreasonable. (Tab A, Kinney Dep. 174-176.)

On May 15, 2003, Salmonsen and Davis met with Kinney and asked her what else she wanted them to do for her. She repeated her demand that they discharge Martin, saying that she would leave if they did not do so. (Tab A, Kinney Dep. 177.) Kinney also gave them a handwritten note in which she wrote that she expected to be given paperwork that would be filed with corporate as a report and that she had been assured Martin would be terminated. (Tab A, Kinney Dep. 178-180; Kinney Dep. Ex. 14.) Kinney admitted at her deposition that nobody ever made such a promise to her. (Tab A, Kinney Dep. 178-180.)

Cohen telephoned Kinney again on or about May 19, 2003. During the conversation, Kinney demanded that the Company discharge Martin and threatened to leave if this did not happen. (Tab A, Kinney Dep. 182-183.)

On May 23, 2003, Cohen returned to Haverhill to meet with Kinney and Salmonsen. When Cohen asked Kinney if Martin had come near her since April 30, she responded, "[o]f course not." (Tab A, Kinney Dep. 184.)[2] Cohen then stated that they had accomplished what needed to be done. Kinney disagreed, stating that they had accomplished that they wanted but not what she wanted because she wanted Martin fired. (Tab A, Kinney Dep. 184-185.) Cohen responded that the Company had gotten Martin away from her and as of that date Martin had indeed stayed away from Kinney. (Tab A, Kinney Dep. 185; Tab B, Cohen Dep. 43.)

---

[2]    Even if the Court accepts Kinney's proposed changes to her deposition testimony, she admits to responding "No," when asked if Martin had bothered her since April 30. Plaintiff's errata sheets are included at Tab E.

On May 28, 2003, Cohen sent Kinney a letter confirming the steps taken in response to her complaint and that she had not had any further contact with Martin. (Tab A, Kinney Dep. 198-200; Kinney Dep. Ex. 15.)

**E.      Kinney resigns her employment when the Company refuses to discharge Martin**

Following the May 23 meeting with Cohen and Salmonsen, Kinney decided that she would resign her employment if the Company did not discharge Martin. (Tab A, Kinney Dep. 203-204.) She waited, however, until June 12, 2003 before resigning, hoping things would change and the Company would fire him. (Tab A, Kinney Dep. 203-204.)

During early June 2003, Kinney requested that she be allowed to take paid vacation time for a medical procedure later that month. Kinney believed she would be able to borrow paid vacation even though she was not yet eligible to take it. Davis denied the request after determining that she was not yet eligible under the applicable collective bargaining agreement to take paid vacation. After learning that her request had been denied, Kinney prepared her resignation letter and mailed it to Davis on June 12, 2003. In the letter, she wrote: "As you know, on June 2, 2003, I filed a charge of discrimination with MCAD...." even though she had no idea whether or not Davis knew she had filed her charge. (Tab A, Kinney Dep. 228-229; Kinney Dep. Ex. 8.) Kinney stipulated that the vacation time denial was the only retaliatory act she experienced and that it was the precipitating cause of her resignation. (Tab A, Kinney Dep. 137.)[3]

---

[3]      The stipulation arose in the context of examination regarding vacation pay, specifically the following exchange: Q: You claim that BioSystems denied you vacation pay in retaliation for having filed the first charge, correct, that's what you state in your third paragraph, correct? A: Correct. (Tab A, Kinney Dep. 134.)

CHICAGO/#1297606.4
3774722v1

## III.  ARGUMENT

### A.  Kinney Cannot Establish That She Was Constructively Discharged

To prove constructive discharge, Kinney must "show that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002) (internal quotation marks omitted); Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 36 (1st Cir. 2001). The standard is an objective one; an employee's subjective perceptions do not govern. Marrero, 304 F.3d at 28; Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000). It is not enough that a plaintiff suffered "the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Suárez, 229 F.3d at 54.

When an employee claims that harassing conduct prompted the decision to resign, *the court evaluating a constructive discharge claim shall take into account how the employer responded to the plaintiff's complaints* and whether it was likely that the harassment would continue. See Marrero, 304 F.3d at 28 (emphasis added.)  Thus, Kinney must offer evidence that her working conditions were so unpleasant that "staying on the job while seeking redress [would have been] intolerable." Keeler v. Putnam Fid. Trust Co., 238 F.3d 5, 10 (1st Cir. 2001).  She cannot do so because (i) the Defendants effectively and appropriately remedied the harassment after April 30; (ii) even if the remedy was not appropriate, Kinney admits she quit because Defendants denied her request to borrow paid vacation; and (iii) Kinney's working conditions were not intolerable when she resigned.

#### 1.  Defendants' response to Plaintiff's April 30 complaint effectively remedied the alleged harassment

An employer is not liable for sexual harassment if it takes prompt, effective, remedial action. Hayes v. Henri Bendel, Inc., 945 F. Supp. 374, 380 (D. Mass. 1996).  "[T]he chief measure of adequacy of an employer's response is not the victim's own personal sense of justice, but rather –

-9-

particularly where there is no prior history of workplace harassment – whether the behavior that gave rise to the complaint has ceased and does not threaten to reoccur." Saad v. Stanley St. Treatment & Res., Inc., 1994 WL 846911, at *10 (D. Mass. May 20, 1994) (citing Ellison v. Brady, 924 F.2d 872, 881 (9th Cir. 1991) (remedy should be reasonably calculated to end the harassment and proportionate to the offense)); Sarin v. Raytheon, 905 F.Supp. 49, 53 (D.Mass.1995) (prompt responses, warnings, and interviews, sufficient).

After Kinney complained on April 30, the Company began an investigation, warned Martin, changed his start time, required him to load his truck at the end of the day so he would spend less time in the facility in the morning, required him to pull off to the side of the road if Kinney was still at the facility when he was returning at the end of the day and had him sign a memo acknowledging the warning. There is no dispute that these steps that effectively prevented any potential for harassment because in the six weeks that Kinney worked after April 30, she had no contact with Martin. He never said another word to her and never came in contact with her. Indeed, when asked several weeks before her resignation if she had any further problems with Martin, Kinney said she did not. This response, where no corroboration was found is, as a matter of law, appropriate because it was reasonably likely to put an end to the alleged harassment. See Cerqueira v. Corning Net Optix, No. Civ. A. 03-10306-DPW, 2004 WL 1932758 at *7 (D. Mass. Aug. 13, 2004) (empoyer's response was adequate where it proposed steps, such as moving the plaintiff's work station, changing his shift or transferring him to another building, that were reasonably calculated to end the alleged harassment) (copy attached).

Martin's continued employment, albeit on a different schedule, does not render Defendants' response inadequate. With no corroboration of Kinney's claims and no prior history of harassment, Defendants cannot be faulted for taking action short of discharging the accused; particularly when

-10-

the harassment did not reoccur and no further complaints were made. While the remedy was not what Kinney wanted, it had the desired effect in that the harassment ended. See Bailey v. Runyon, 167 F.3d 466, 468 (8th Cir.1999) (the law does not require an employer to fire or take any other particular type of action against an alleged harasser); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 676 (10th Cir. 1998) (employer is not required to terminate a perpetrator except where termination is the only response that would be reasonably calculated to the end the harassment); Knabe v. Boury Corp., 114 F.3d 407, 414 (3rd Cir. 1997) (if the remedy chosen by the employer is adequate, an aggrieved employee cannot object to that selected action).

Unable to establish that the Company's response was inadequate as a matter of law, Kinney cannot avoid summary judgment on her constructive discharge claim because once the harassment was adequately remedied after April 30, it became impossible for her to establish that her working conditions were intolerable.

2.    **Kinney admitted to quitting because her request for paid vacation was denied, not because the Defendants' response to the alleged harassment was inadequate**

At her deposition, Kinney stipulated that her decision to resign was precipitated by the denial of her request for paid vacation. (Tab A, Kinney Dep. 134.) As a result, she cannot now point to either the alleged inadequacy of Defendants' response as the cause of her resignation. Nor can she point to the alleged staring and leering she now claims to have experienced. To avoid summary judgment, Kinney must convince this Court that the denial of her request for paid vacation made her work conditions intolerable. She cannot do so. See Foley v. Proctor & Gamble Distributing Co., No. Civ. A. 01-11314-RWZ, 2003 WL 21696544 (D. Mass. July 21, 2003) (decision to resign was based not only on alleged conditions, but on also on the plaintiff's desire to attend business school).

### 3.     Kinney's working conditions were not intolerable when she resigned

Summary judgment is appropriate here even if the Court were to conclude that Defendants' response to her April 30 complaint was not adequate. Constructive discharge claims are subject to a higher standard than a hostile environment claim which requires only that the alleged conduct be severe and pervasive. Here, Kinney cannot show that her work environment was intolerable because the harassment stopped after April 30. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 45 (1st Cir. 2003) (plaintiff unable to establish constructive discharge where company moved her away from alleged harasser shortly after she complained).

Even if the Court considers Kinney's claim (assumed to be true at summary judgment) that Martin was "standing off in the distance and staring" at her (Tab A, Kinney Dep. 169), that is not enough to create intolerable working conditions. The alleged harassment admittedly ended on April 30 and staring at someone, without more, is not sufficient to create a hostile work environment. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1249 (11th Cir. 1999); Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 555 (5th Cir. 1997) (holding harasser's slamming doors, *staring at plaintiff*, stating plaintiff might be his personal secretary, and giving unreasonable work assignments to plaintiff were not so severe or pervasive as to constitute sexual harassment); Iskandar v. Mary Hitchcock Mem. Hosp., 81 FEP Cases 1518 (D. N.H., 2000) (employee's testimony that co-worker stared at him on occasions after name-calling incident was not enough to create hostile environment).

The only other workplace occurrence about which Kinney complains is the denial of her request to borrow paid vacation time before she was eligible to do so. This is not enough. As shown above, Kinney's request was denied pursuant to the collective bargaining agreement. If she had reviewed the agreement before resigning, she would have discovered that Davis was simply

-12-

adhering to the agreement when he denied her request. Even if Kinney were to claim that she should have been offered unpaid time-off, that would not be sufficient to create intolerable working conditions. Failing to provide a benefit to which an employee is not entitled is, at most, exactly the type of "sling or arrow" that an employee may encounter in this "hard, cold world" without being able to establish a constructive discharge claim. See Suarez, 229 F.3d at 54.

Moreover, Kinney never even bothered to grieve this decision or otherwise ask Davis to reconsider. As such, that the denial of her request was not severe enough to affect her workplace in a material way. See Brooks v. City of San Mateo, 229 F.3d 917, 929-30 (9th Cir. 2000) (actions of employer to reschedule the plaintiff to an unfavorable shift and reject her vacation preferences were not final adverse employment actions for purposes of Title VII retaliation claim because after the plaintiff complained, the employer allowed the plaintiff to switch shifts and vacation dates with other employees).

**B.    Summary Judgment Is Appropriate on Kinney's Retaliation Claims in Counts III and IV**

Kinney alleges that the Company denied her request to take paid vacation time five months before she was allowed to do so under the collective bargaining agreement in retaliation for her complaints about sexual harassment. Kinney can prove that claim in two ways. She could offer direct evidence of retaliatory intent, or circumstantial evidence under the McDonnell Douglas burden shifting methodology. Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 64 (1st Cir. 2002). Because Kinney has no direct evidence of retaliation, she must proceed circumstantially.

Her first burden under McDonnell Douglas is to establish a *prima facie* presumption of discrimination. To do that she must show that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. Benoit v. Technical Mfg. Corp., 331 F.3d

-13-

166, 175 (1st Cir. 2003). If Kinney can meet that burden, it is the Company's obligation to articulate a non-discriminatory reason for its decision. The burden then returns to Kinney to show that the Company's reason is a pretext and that the job action was the result of the defendant's retaliatory animus. Kinney at all times retains the ultimate burden of showing intentional retaliation and to survive summary judgment she must show that a reasonable fact-finder could find in her favor on that issue. Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 24 (1st Cir. 2004).

1.    **Kinney cannot establish a *prima facie* case of retaliation.**

Kinney cannot make out a *prima facie* case because she did not experience an adverse employment action – she was not constructively discharged and the denial of her request to take paid vacation time before she was entitled to do so under the collective bargaining agreement does not rise to the level of an adverse employment action.

The terms and conditions of employment for BioSystems employees at the Haverhill facility, as set forth above, are governed by a collective bargaining agreement. This Agreement provides that employees are not entitled to take vacation until they have been employed for one year. (Tab A, Kinney Dep. 143-144; Kinney Dep. Ex. 11.) Employees at BioSystems accrue paid vacation time during their first year of employment, but are not eligible to take the paid time off before their one-year anniversary date. (Tab A, Kinney Dep. Ex. 11.) Kinney had been employed for less than seven months when she requested her paid vacation and thus was not yet entitled to take any such time. As a result, the decision to deny her request does not constitute an adverse employment action. See Wynn v. Paragon Systems, Inc., 301 F.Supp.2d 1343 (S.D. Ga. 2004) (one-time denial of vacation request does not qualify as a serious and materially adverse change in the terms and conditions of employment); Hunter v. St. Francis Hosp., 281 F.Supp.2d 534, 544 (E.D. N.Y. 2003) (denial of a one-time vacation request is not an material adverse employment action).

-14-

CHICAGO/#1297606.4
3774722v1

### 2.    Kinney cannot show that the reason for the denial of her request is pretextual

Even if Kinney could make a *prima facie* showing, the Defendants have offered a non-retaliatory reason for denying Kinney's request for paid vacation – that she was not yet permitted to do so under the collective bargaining agreement.  The burden then shifts to Kinney to prove this reason was pretextual which, in Title VII terms, requires showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a fact finder could infer that the employer did not act for the asserted non-discriminatory reasons." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000).

There is not a shred of evidence that Davis denied Kinney's request because she complained about sexual harassment and/or filed a charge with the MCAD.  The decision was in keeping with the rules set forth in the collective bargaining agreement.  There is nothing inconsistent, incoherent, improbable or contradictory about the Company's reason.

The fact that the Company allowed Martin, the alleged harasser, to take time off before his anniversary date is not probative because *he took the time off without pay*.  Martin testified that he took time off during his first year, but it was *unpaid* because he was not yet eligible for (paid) vacation.  (Tab D, Martin Dep. 69.)  There is no evidence that Martin either requested or received vacation time (which is paid time off) before he was entitled to take it.  Thus, Kinney cannot show that similarly situated employees who did not engage in protected activities were treated any better than she was treated and she admitted as much at her deposition.   (Tab A, Kinney Dep. 142-143; 221-223.)

Accordingly, this Court should grant summary judgment as to Counts III and IV of Kinney's Complaint.

CHICAGO/#1297606.4
3774722v1

## IV.    CONCLUSION

For the reasons set forth above, Defendants Stericycle, Inc. and BioSystems respectfully requests that this Court grant summary judgment as to Counts III and IV as well as Kinney's constructive discharge claim in Count V.

Respectfully submitted,

Stericycle, Inc. and
Scherer Healthcare, Inc. d/b/a Bio Systems,

By Their Attorneys,

Thomas E. Shirley (BBO # 542777)
Lisa M. Gaulin (BBO # 654655)
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA 02109-2804
Telephone:  (617) 248-5000
Facsimile:  (617) 248-4000

Steven L. Hamann (admitted *pro hac vice*)
Aaron R. Gelb (admitted *pro hac vice*)
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street
Suite 2600
Chicago, IL 60601-1003
Telephone:  (312) 609-7500
Facsimile:  (312) 609-5005

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY (MAIL) HAND ON
DATE 12 7    SIGNATURE

December 7, 2004